Filed 9/17/20  In re A.P. CA2/8

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION EIGHT

| | |
|---|---|
| In re A.P., a Person Coming Under the Juvenile Court Law. | B303620 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | (Los Angeles County Super. Ct. No. 19LJJP00265) |
| Plaintiff and Respondent, | |
| v. | |
| S.P., | |
| Defendant and Appellant. | |

APPEAL from findings and order of the Superior Court of Los Angeles County, Michael C. Kelley, Judge.  Affirmed.

John P. McCurley, under appointment by the Court of Appeal, for Defendant and Appellant.

Mary C. Wickham, County Counsel, Kristine P. Miles, Assistant County Counsel, and Sally Son, Deputy County Counsel, for Plaintiff and Respondent.

———————————

## INTRODUCTION

Mother appeals from the juvenile court's jurisdictional findings and removal order regarding her minor daughter A.P. She contends the evidence was insufficient to support the juvenile court's findings that: 1) Mother's history of mental and emotional problems prevented her from caring for A.P. and placed A.P. at risk of harm; 2) Mother is unable to provide A.P. with ongoing supervision, given A.P.'s self-mutilation and suicidal ideations; and 3) removal from Mother's custody was necessary to protect A.P. from a substantial risk of harm.

We conclude substantial evidence supports the juvenile court's jurisdictional findings and order removing A.P. from Mother's care.

## FACTUAL AND PROCEDURAL BACKGROUND

A.    *Events Leading to Dependency Jurisdiction*

On April 3, 2019, Mother's 11-year-old daughter A.P. came to the attention of the Los Angeles County Department of Children and Family Services (DCFS) when A.P. cut herself with "a sharp blade" after having "thoughts of feeling hopeless." A.P. had "15 fresh superficial marks on both arms/wrist." It was reported by the referring party that A.P. mentioned her mother is "working on herself."

DCFS learned A.P. resides with her adult brothers Jose and Mark in a single-story home.[1] A.P. sleeps on a bed in the living room. According to Jose, A.P. had been living with him and Mark since "the beginning of the school year because the

---

[1]    Mother has three adult children—Jose, Mark, and Samantha.

2

family decided it would be 'better' for" A.P.  Jose explained because Mother lives in Lancaster and works in Los Angeles, A.P. "would have to wake up at 4:00 a.m. to be . . . on time for school." He recalled Mother "worked a lot" during his childhood too (Jose grew up in his father's care), but stated she has "always been around."

The DCFS social worker (CSW) inquired about A.P. cutting herself; Jose stated he "does not have concerns" but "does want to assist [A.P.] in receiving services."  Jose believed A.P. cut herself "because of the crowd of friends she has been hanging out with at school," whom he described as "emo."  When the CSW inquired about A.P.'s doctor, Jose reported he does not have any information "because mother takes [A.P.] to the doctor."  Jose admitted he does not have legal guardianship over A.P., nor any legal documentation granting him custody, or rights to enroll her in school or seek medical treatment on her behalf.

While interviewing A.P., the CSW observed she had 15 horizontal cut marks on each arm.  A.P. admitted she cut herself at school on April 2, 2019, with a pencil sharpener blade she obtained "from her friend who also cuts herself."  She reported having wanted to kill herself in fifth grade "due to feelings of sadness."  A.P. reported she felt "empty" and "felt triggered to cut herself because she wants to know her father" whom she has never met.

When asked about her relationship with Mother, A.P. reported she is "not close" with Mother and does not want to live with her.  A.P. was willing to participate in therapy and reported Mother had agreed to enroll her in therapy.

DCFS investigated the family's prior welfare history and discovered the following:

3

- January 11, 2001:  A referral alleged general neglect of (then minors) Samantha and Mark, as Mother "left the home for the last three months."  The home appeared "filthy."  Mark came to school hungry, with no lunch money; he was also observed wandering the streets at night.
- September 4, 2010:  The referring party stated Mother brought A.P. to a pediatrician after noticing a "slight redness and puffiness" in A.P.'s vagina.  When Mother asked if anyone touched her, A.P. reportedly responded with the name of 30-year-old neighbor Larry and six-year-old Ginger.  The pediatrician instructed Mother to take A.P. to Children's Hospital; she did not.  The caller described Mother as "guarded, irritated when questioned for further details," and "uncooperative."  The caller said Mother may be "suffering from a mental health disorder," "could have a psychiatric issue, or might have been under the influence."  DCFS could not locate Mother and A.P.; the referral was closed as "contact attempted/can't locate."
- April 2, 2013:  The reporting party noticed a bruise on A.P.'s right eye and cheek area ("a black eye").  A.P. said her brother beat her up because "he doesn't like me."  The referral was closed as "situation stabilized", as all family members maintained the injury was accidental while playing.
- October 16, 2013:  A.P. came to school "very upset and crying" because she witnessed Mother and then-minor Samantha fighting at home; they threw chairs, umbrellas, and other objects at one another and

4

"destroyed the home." A.P. appeared "anxious and depressed" and was concerned someone was "going to get hurt and die." The referral was closed as "situation stabilized", as family members denied any conflict between Samantha and Mother other than "typical mother/teen arguments."

- August 11, 2014: Mother went to the police station to file a missing person's report for (then 18-year-old) Samantha, who had run away. An officer reported "odd" and "crazy" behavior by Mother. He observed Mother "yelling and screaming" at A.P. multiple times while the child was reading. The officer stated there "seemed a lack of love" and that Mother was "cold" and "distant" with A.P. The officer observed Mother "walking at least 20 to 30 feet ahead of the child and not paying her any attention."

    An up front assessment (UFA) was completed for Mother, indicating Mother "did appear to have some mental health issues, including paranoia, as she disclosed . . . someone is stalking her and possibly trying to poison her and her daughter." Mother was even suspicious of the UFA assessor and questioned her credentials. The UFA found Mother met criteria for unspecified schizophrenia spectrum and other psychotic disorders. Despite these concerns, the referral was closed as "situation stabilized."

- August 27, 2018: Referring party reported Mother emotionally abused A.P., who was crying in class. A.P. said she "had so much on her mind because she has to 'take care of' mother." She said Mother is "paranoid

5

that people in her past are 'coming after her' " and that people are "following" her. A.P. stated Mother stopped saying "the crazy things" two months ago, and that Mother "only took medication when she was hospitalized." A.P. asked the reporting party not to contact her family as she "should not be talking . . . about mother" because it is supposed to be "a secret." When asked about therapy, A.P. said, "No, my mom says nothing is wrong with me."

The CSW met with A.P.'s school psychiatric social worker, Ms. Joya, who sees A.P. twice a week. A.P. was initially referred by a teacher after A.P. commented about "feeling sad because she does not have a father." Ms. Joya recommended A.P. receive therapy services through victim's intervention program (VIP). She reported Mother appeared "guarded" and has "possible mental health issues."

The CSW next interviewed Mother at the DCFS office, but "[i]t appeared mother had been drinking as she had an odor of alcohol." Mother was "concerned" that A.P. cut herself, but said A.P. "does not talk to her." Mother confirmed A.P. resides with her two adult sons. When the CSW asked to assess Mother's home, Mother asked: "[D]oes this mean I have to put [A.P.]'s bed in her room?" Mother said she did not have any flooring in her home and stated A.P.'s bed was in the hallway.

As for A.P.'s father, Mother reported she does not know his name, and she last saw him 10 years ago. She said A.P.'s father was abusive and a "stalker." She said he "sends these Social Workers to my house and they look just like his sister. Isn't that weird. His sister has a way to get into your brain and control

you."  The CSW terminated the interview as Mother's statements were "not making sense."

The CSW next interviewed A.P.'s other adult brother, Mark.  Mark stated he "did not expect" A.P. to cut herself because she is "talkative and open with him and his girlfriend, Erika" at home.  Mark believed A.P. cut herself "because of the friends she has been hanging out with."

Mark stated he grew up in in his father's care, and Mother "did not have a good relationship" with his father.  Mark stated he himself does not have a relationship with Mother.  He said he is not concerned with Mother's behavior because to him, that is her "normal behavior."  He believed Mother tends to "emotionally" hold onto things.  Mother does not have consistent contact with A.P.; the last time A.P. spent the night at Mother's home was "over a month ago."  Mark said Mother calls him before initiating contact with A.P.  He said he is willing to continue caring for A.P.

Mark's girlfriend Erika reported she has been around the family for the last 10 years, and "has not seen much contact" between Mother and A.P.  She expressed concern about Mother because she seemed "very isolated."

A.P.'s adult sister, Samantha, was similarly concerned about Mother.  She believed Mother "could be depressed" and described her as a single mother who "works a lot" and "has been dealing with a lot."  When asked why A.P. lives with her adult brothers, Samantha stated "the family decided [it] was more stable" for A.P.  She believed A.P. cut herself "because of the group of friends [she] hangs out with."

DCFS was concerned by Mother's failure to address A.P.'s mental health concerns, in light of A.P. having cut herself "approximately 30 times, 15 times on both left and right arm." DCFS was further concerned Mother had not made the necessary legal arrangements to enable A.P.'s adult brothers to make decisions regarding her school enrollment and ability to receive mental health or medical services. DCFS was concerned A.P. would attempt to harm herself in the future if her mental health needs were not met. Based on the foregoing, DCFS recommended A.P. be detained from Mother.

B.    *Petition and Detention*

On April 23, 2019, DCFS filed a Welfare and Institutions Code section 300[2] petition on A.P.'s behalf. It alleged:

- Count b-1: Mother has "a history of unresolved mental and emotional problems which manifest as paranoia and bizarre behaviors. Such mental and emotional conditions have prevented Mother from caring for [A.P.] and this has endangered the child's physical health and safety and places the child at risk of serious physical harm and damage."[3]

- Count b-2: Mother "is unable to provide the child with ongoing care and supervision due to the child's self-mutilating behaviors and suicidal ideations. The child refused to return to the mother's care. Said inability of

---

[2]    All statutory references are to the Welfare and Institutions Code, unless otherwise stated.

[3]    We include the operative version of count b-1 (as it was amended by interlineation by the juvenile court).

8

the child's mother endangers the child's physical and emotional health and safety, and places the child at risk of serious physical harm and damage."

At the detention hearing on April 24, 2019, the juvenile court found a prima facie case for detaining A.P. The court found there are no reasonable means by which the child's physical and emotional health would be protected without removing her from Mother's custody/home, and ordered her removal. The court ordered monitored visits for Mother, which DCFS had discretion to liberalize. The court referred Mother to individual family counseling, parenting classes, a psychological/psychiatric evaluation with follow-up treatment as recommended, and random alcohol/drug testing with follow-up treatment if she tests positive. The court ordered DCFS to provide individual counseling referrals to A.P., and to assess Mark and Jose as monitors for Mother's visitation.

Mother submitted a parentage questionnaire to the court, naming V.B. as A.P.'s father.

A.P. was placed with her adult sibling Mark.

C.  *Developments during Dependency Proceedings*

In May 2019, the dependency investigator (DI) interviewed Mark. He reported the cutting incident by A.P. appeared to have been a "one-time thing."

Mother told the DI it was "falsely reported" she has mental or emotional issues. She stated she has never been diagnosed with or hospitalized for any mental health disorder. She told the DI: "I'm not paranoid I know what I see . . . I have a stalker and they use other people like police officers to harass me." She explained "the same people and cars [have been] harassing her

9

for many, many years." She told the DI she "knows of two incidents of cutting" by A.P. and believes it is because of bullying.

A.P. told the DI her "ex friends" said mean things and "encouraged" her to cut her arms with them. A.P. denied having current thoughts of self-harm or suicide. She stated she "really disliked the cutting" and has no plans to do it again.

DCFS advised the court that A.P. had not yet been linked to services due to "lack of cooperation and follow-up by the current caregiver." The Department of Mental Health assessor reported A.P.'s caregiver did not follow through with obtaining service providers for A.P. as originally agreed.

In July 2019, DCFS informed the court A.P. has been receiving therapy through VIP once a week for the last few weeks.

In August 2019, Mother told the CSW she had not enrolled in any programs because her attorney told her she did not have to as they are going to trial. Mother maintained she did not have any mental health problems and denied substance abuse.

On September 3, 2019, the juvenile court found V.B. to be A.P.'s biological father.

On October 24, 2019, A.P.'s school psychologist reported A.P. "had been cutting with the intent to die and went around school telling her friends goodbye because she said she's going to kill herself." A.P. was transported to a hospital and placed on a 72-hour hold.

At the end of the 72 hours, A.P.'s psychiatric hold was extended because A.P. was "very guarded", "minimized the situation", and "was not disclosing any information." When Mother found out, she cursed and questioned why the hospital was pushing to get information from A.P. She asked, "Why the

fuck is she being questioned. If she doesn't want to fucking answer any fucking questions she doesn't have to answer any." Mother was adamant the reason for A.P.'s self-harm was due to bullying at school. The CSW noted at some point during the conversation that Mother "would repeat the same story not making sense."

A.P. was released from the hospital on October 30, 2019.

On December 5, 2019, now almost 8 months after the detention hearing, DCFS informed the court Mother "has not made any progress towards case plan goals" and was a "no show" to the last four drug/alcohol test dates. Mother believed there was nothing wrong with A.P. and that she cut herself because of bullying; Mother "placed the blame on the school." DCFS expressed concerned about Mother's "verbally aggressive behavior and possible mental health issues" and recommended Mother participate in a mental health evaluation.

Mother consistently visited A.P., and A.P. did not report any issues with the visits.

D. *Adjudication*

The jurisdictional and dispositional hearings took place December 10 and 24, 2019.

Mother testified at length. She denied having mental health issues. When asked whether she has ever had a mental health assessment, she replied: "Why should I when I don't have any problems?"

Mother said A.P. informed her about the bullying sometime in March or April of 2019. She believed A.P. did not have mental health issues; "I don't believe she has any problems. I mean, it's about bullying, people bullying her. It's not her." When asked if switching schools would help, Mother stated it would not,

11

because "where she's at right now it's more of *their* home ground or where *they're* actually moved . . . to since the early 80's so it's a close by area school where I have personal issues with *certain family members*." (Italics added.) She believed these family members were bullying A.P. and were responsible for what A.P. experienced at school. According to Mother, "*They* can't just get over . . . them being a fucking bunch of losers, stalking snitches that they are. And she is being bullied by *a family* that she thinks . . . means something when they don't." (Italics added.) When asked to clarify if they are maternal or paternal relatives, Mother stated they are not related to A.P.

Mother identified her stalkers as Ruby and Darlene; she called Ruby a "stalking rat out of Redwood City." She stated she has caught Ruby stalking her in several locations, including at the market and on the bus. She had "more physical altercations with them" after they moved into the area she lived. She said they "constantly dress[ed] like LAPD officers." She stated she has also seen them work in numerous fast-food restaurants close to her home; she "stopped going" to those restaurants when she got sick after eating there. The stalking began sometime in the "early nineties."

Mother next discussed A.P.'s father. She said "Father and whoever his friends are" have a problem. "They're idiots." "[T]hey harass my daughter and it's [*sic*] friends and his family, yeah, it's a problem." She repeated A.P.'s father and his friends are harassing A.P.; "they're a bunch of little ugly-ass fucking kids." She asked, "how many times do I have to kick their asses for them to fucking stop, and then they want to use police on me." She stated she has been in "5 to 10" physical altercations with them. She admitted that one of these altercations happened in

12

A.P.'s presence, about four years ago. When asked about A.P.'s father's sister, Mother stated "he doesn't have a sister that I know of."

After hearing argument, the juvenile court sustained the allegations in the petition and declared A.P. a dependent of the court under section 300, subdivision (b). The court found "ample evidence to support . . . sustaining the petition." The court found "a nexus between Mother's mental and emotional issues and a substantial risk of physical harm" to A.P. In support, the court made many findings, as follows.

"While [A.P.] and other witnesses described the self-harming conduct in April as a one-time event, and Mother has insisted that it was due to bullying at school, later, on October 24th, 2019, [A.P.] was transported to the hospital after another self-harming incident. According to her school psychologist, [A.P.] had again been cutting herself and this witness told the Department that [A.P.] acted with the intent to die and went around school telling her friends goodbye because she said she was going to kill herself. This was not the first time that she had expressed these thoughts." The court noted A.P. stated she "had also wanted to kill herself in the fifth grade."

The court found "there is a nexus between [A.P.]'s mental and emotional issues at school and her mother. In a referral in 2018, . . . it was reported [A.P.] was crying at school because she 'had so much on her mind because she has to take care of her mother.' She explained that her mother is paranoid and thinks people are following her and coming after her."

13

"The evidence also supports the court's finding that Mother has not been able to care for [A.P.]." "When Mother was told about [A.P.'s 72-hour hold being extended] by the Department, she reacted angrily with cursing and insisted that the only issue was bullying and that there was nothing wrong with [A.P.]."

The court referred to Mother's "past incident with DCFS in 2014" when she filed a missing person's report for Samantha and "a referral was made at that time for Mother's observed verbal abuse of [A.P.] at the police department." The court noted the UFA concluded Mother "met the criteria for unspecified schizophrenia spectrum and other psychotic diagnoses."

The court found Mother launched into a rambling, expletive-laden diatribe during her testimony. She believed "the stalking is perpetrated by Father's family, who has attempted to impersonate police officers and also to working [at] a fast food restaurant she frequents and this has caused her concern that she's being poisoned." "Rather than take some responsibility for helping [A.P.] address the issues that have caused her to engage in self-harming behavior, Mother has essentially allowed [A.P.] to reside with her older brother and insist that the cause of [A.P.]'s issue was bullying." Moreover, A.P. "has not been living with Mother, which corroborates that Mother is not able to care for her. As [A.P.]'s own statements indicate her emotional problems stem, at least in part, from her struggles to deal with Mother's mental issues."

The court proceeded to disposition. The court found returning A.P. to Mother "is contrary to the child's welfare." The court found clear and convincing evidence "there is or would be a substantial danger to the physical health, safety, . . . physical [or] emotional well-being of the child if the child were returned

14

home." The court found "there are no reasonable means by which the child's physical health can be protected without removing the child from the parent's physical custody" and ordered A.P. removed from Mother's care.

The court-ordered case plan for Mother included individual counseling to address case issues, conjoint counseling with A.P., mental health counseling, a parenting program, a 730 evaluation, and drug/alcohol testing (on demand based on reasonable suspicion). The court ordered monitored visitation with A.P., for two hours twice a week, and gave DCFS discretion to liberalize.

Mother timely appealed.

## DISCUSSION

A.    *Substantial Evidence Supports the Court's Assertion of Jurisdiction Over A.P.*

1.    <u>Standard of Review</u>

In reviewing a challenge to the sufficiency of the evidence supporting jurisdictional findings and related dispositional orders, we "consider the entire record to determine whether substantial evidence supports the juvenile court's findings." (*In re T.V.* (2013) 217 Cal.App.4th 126, 133; accord, *In re I.J.* (2013) 56 Cal.4th 766, 773.) "Substantial evidence is evidence that is 'reasonable, credible, and of solid value'; such that a reasonable trier of fact could make such findings." (*In re Sheila B.* (1993) 19 Cal.App.4th 187, 199.)

In making our determination, " ' "we draw all reasonable inferences from the evidence to support the findings and orders of the dependency court; we review the record in the light most favorable to the court's determinations; and we note that issues of fact and credibility are the province of the trial court." [Citation.] "We do not reweigh the evidence or exercise

15

independent judgment, but merely determine if there are sufficient facts to support the findings of the trial court." ' " (*In re I.J.*, *supra*, 56 Cal.4th at p. 773; see *In re Alexis E.* (2009) 171 Cal.App.4th 438, 451 ["[w]eighing evidence, assessing credibility, and resolving conflicts in evidence and in the inferences to be drawn from evidence are the domain of the trial court, not the reviewing court"].)

    2.    <u>Applicable Law</u>

Section 300, subdivision (b)(1), authorizes a juvenile court to exercise dependency jurisdiction over a child if the "child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of his or her parent . . . to adequately supervise or protect the child, or . . . by the inability of the parent . . . to provide regular care for the child due to the parent's . . . mental illness, developmental disability, or substance abuse." (§ 300, subd. (b)(1).) A jurisdictional finding under section 300, subdivision (b)(1), requires DCFS to demonstrate the following three elements by a preponderance of the evidence: (1) neglectful conduct, failure, or inability by the parent; (2) causation; and (3) serious physical harm or illness or a substantial risk of serious physical harm or illness. (*In re Joaquin C.* (2017) 15 Cal.App.5th 537, 561; see also *In re R.T.* (2017) 3 Cal.5th 622, 624.)

    3.    <u>Analysis</u>

Mother challenged the sufficiency of the evidence supporting counts b-1 and b-2.

We begin with count b-1, which provides: Mother has "a history of unresolved mental and emotional problems which

manifest as paranoia and bizarre behaviors.  Such mental and emotional conditions have prevented Mother from caring for [A.P.] and this has endangered the child's physical health and safety and place[d] the child at risk of serious physical harm and damage."

Mother contends the "facts the court relied on do not provide substantial evidence of a nexus between Mother's mental health and harm to A.P."  She believes "there was no reasonable basis for the court to conclude that Mother's mental health posed any risk of harm" to A.P.  She argued the court's findings were "not supported by the record."  We disagree.

"[H]arm may not be presumed from the mere fact of a parent's mental illness" (*In re A.L.* (2017) 18 Cal.App.5th 1044, 1050).  Here, however, there is more than just the presence of possible mental health issues.  Here, we find the record demonstrates Mother's mental or emotional problems did, in fact, "manifest as paranoia and bizarre behaviors" which affected A.P. and placed her at substantial risk of harm.

After learning that her daughter had cut herself 15 times on each arm in April 2019, Mother insisted there was nothing wrong with A.P. and she cut herself because of bullying at school.  When it was reported that six months later, in October 2019, A.P. "went around school telling her friends goodbye" and cut herself "with the intent to die," Mother still insisted the only issue was bullying.

Mother's focus on the bullying misses the point.  Cutting oneself 15 times on each arm at age 11, in response to bullying, is not a rational or productive response.  It is an extreme measure that must be addressed before another serious physical injury follows; in fact, A.P. did suffer another cutting episode in October

17

2019, and expressed her intention to die. For whatever reason, Mother was and remains unable to focus on the need to seek professional help for A.P., if only to effectively and safely deal with the bullying, which Mother feels is the cause of A.P.'s desire to cut herself. Mother's own aggressive defense against the idea that she herself may suffer from one or more mental disorders could be what prevents her from appropriately helping her own daughter. That the juvenile court so concluded is a rational inference.

Further, this was not the first time Mother had learned of A.P.'s struggles and done nothing to help her. Mother had told the DI she knew of two incidents of cutting by A.P. (prior to A.P.'s third incident in October 2019). Mother's inability to accept and/or address her own mental health issues mirrors her inability to do the same regarding her daughter's mental health issues.

Mother had the opportunity to try to resolve the problem by enrolling herself and A.P. in programs and counseling recommended by DCFS. She could have participated in conjoint counseling with A.P. Instead, there was considerable delay in signing A.P. up with services because of "lack of cooperation and follow-up" by A.P.'s caregivers. By December 5, 2019, almost eight months into the dependency proceedings, Mother had "not made any progress towards case plan goals" and was a "no show" to the last four drug/alcohol tests. Mother did not accept any responsibility and instead placed the blame on the school.

Mother's testimony about being stalked by paternal relatives could have been credited as based in reality or credited as falsely arising from paranoia. That the juvenile court chalked it up to paranoia was not irrational or arbitrary. Mother's

18

testimony at the hearings was intense, contradictory, and, at times, nonsensical.  That same paranoia is what had caused A.P. to cry at school and worry that she "had so much on her mind because she has to take care of her mother."  This should have signaled to Mother that A.P. was suffering some emotional or mental issues that needed to be addressed; at the very least, Mother should have had a discussion with A.P. to determine how to best minimize A.P.'s worries.  Instead, Mother blamed others, refused to arrange for appropriate mental health counseling, and abdicated responsibility for A.P.'s needs to A.P.'s adult brothers with whom A.P. resided and where she slept in a bed in the living room.  Thereafter Mother saw her daughter sporadically.

Based on the foregoing, we conclude substantial evidence supports the juvenile court's jurisdiction per count b-1 of the petition.  Where, as here, " 'a dependency petition alleges multiple grounds for its assertion that a minor comes within the dependency court's jurisdiction, a reviewing court can affirm the juvenile court's finding of jurisdiction over the minor if any one of the statutory bases for jurisdiction that are enumerated in the petition is supported by substantial evidence.' "  (*In re I.J.*, *supra*, 56 Cal.4th at p. 773.)  Thus, "a single jurisdictional finding supported by substantial evidence is sufficient to support jurisdiction and render moot a challenge to the other findings." (*In re M.W.* (2015) 238 Cal.App.4th 1444, 1452.)  In such cases, we need not consider whether the other alleged grounds for jurisdiction are supported.  (*In re Alexis E.*, *supra*, 171 Cal.App.4th at p. 451.)  We thus need not address the remaining allegations per count b-2.

19

B.   *Substantial Evidence Supports the Juvenile Court's Removal Order*

### 1. Standard of Review

We proceed with our review of Mother's challenge to the juvenile court's order removing A.P. from Mother's custody; we search the record for substantial evidence. (*In re Francisco D.* (2014) 230 Cal.App.4th 73, 80.)

### 2. Applicable Law

Section 361, subdivision (c) authorizes the juvenile court to remove a child from the physical custody of the parent if the court finds clear and convincing evidence there is or would be "a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor" if returned home, and that there are no reasonable means of protecting the minor's physical health without removal from parent's physical custody. (§ 361, subd. (c)(1).)

### 3. Analysis

The juvenile court found "there is or would be a substantial danger to the physical health, safety, . . . physical [or] emotional well-being of the child if the child were returned home." The court further found returning A.P. to Mother "is contrary to the child's welfare" and ordered A.P. removed. We conclude substantial evidence supports the juvenile court's order removing A.P. from Mother's care.

A.P.'s living arrangement at Jose's and Mark's home did not preclude the need to remove A.P. from Mother's care, custody, and home. Neither brother had the ability or legal right to enroll A.P. in school or seek medical and mental health treatment for her, as Mother had not provided them with any legal paperwork

20

to enable them to do so.  Should A.P. be hospitalized again, Mother would have final say as to A.P.'s treatment.  Based on Mother's steadfast refusal to acknowledge that A.P.'s extreme cutting response to alleged bullying raises mental health issues, Mother's emotional volatility, her actions and statements in the record, and her erratic and contradictory testimony at the adjudication hearing, we agree with the juvenile court that returning A.P. to Mother is contrary to A.P.'s welfare.  We affirm.

## DISPOSITION

The juvenile court's jurisdictional findings and removal order are affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


STRATTON, J.

We concur:



GRIMES, Acting P. J.



WILEY, J.

21